O

# United States District Court
# Central District of California

| | |
|---|---|
| PRO WATER SOLUTIONS, INC., | Case № 2:19-CV-08704-ODW (SSx) |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT [36]** |
| ANGIE'S LIST, INC., et al., | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff Pro Water Solutions, Inc. ("ProWater") brings this putative class action against Defendants Angie's List, Inc. ("ALI") and Angi Homeservices Inc.'s ("AHI") on behalf of itself and others who used ALI's website to promote their businesses. (*See* First Am. Compl. ("FAC"), ECF No. 33.)  Presently before the Court is Defendants' Motion to Dismiss the FAC, (Mot. Dismiss FAC ("Motion" or "Mot."), ECF No. 36), which, for the following reasons, is **GRANTED**.[1]

## II.   BACKGROUND

ProWater is in the business of providing water treatment services, and this case arises from its efforts to market those services through the use of two websites run by

---

[1] After carefully considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

ALI and non-party HomeAdviser, Inc. ("HomeAdvisor"), respectively. (*See generally* FAC.)

**A.   ALI**

ALI operates a website through which users can locate and evaluate businesses to hire for various contracting jobs. (*See id* ¶¶ 4, 7.) Businesses that advertise their services on ALI's website ("Service Providers") must register with ALI and pay a fee to do so. (*Id.* ¶ 5.) From 2011 to 2019, ProWater was a registered Service Provider with ALI. (*See id.* ¶¶ 12, 16.)

All of ALI's Service Providers must, at minimum, sign a Service Provider User Agreement ("SPUA") and agree to ALI's Privacy Policy. (*See id.* ¶¶ 17, 21; *id.* Ex. B ("SPUA")[2] 9 ("In consideration of [ALI] granting the [Service Provider] access to its Website and the information contained therein, and in order to use the Website, [the Service Provider] must read and accept all of the Terms and Conditions in, and linked to, this [SPUA]."); *id.* Ex. C ("Privacy Policy") 1 ("By using [ALI's] Site and Services you consent to the terms of this Privacy Policy.").)

ProWater brings this action based on two terms in the SPUA. First, the SPUA provides that ALI will not share the Service Provider's contact information with any third parties:

> The [Service Provider] acknowledges that [ALI] will use the telephone numbers, email addresses and facsimile numbers that are submitted to [ALI] in connection with registering with [ALI] to contact the [Service Provider] with information regarding [ALI]. *[ALI] agrees not to sell, trade, rent or share such information with any third parties*.

(SPUA 12 (emphasis added); *see* FAC ¶ 24.) Significantly, though, the Privacy Policy also states that ALI "do[es] not disclose Personal Information to third parties, *except when . . . [t]he party to whom the disclosure is made . . . is under common control with [ALI]*." (Privacy Policy 4 (emphasis added).)

---

[2] Because Exhibits A and B to the FAC are substantially similar versions of the SPUA with no material differences affecting the outcome of the Motion, references to the SPUA herein cite only to the more recent version, which is attached to the FAC as Exhibit B.

Second, the SPUA provides that ALI is not liable for reviewing the content that consumers or Service Providers post on the ALI website:

> The [Service Provider] acknowledges and understands that *[ALI] simply acts as a passive conduit* and an interactive computer provider for the publication and distribution of Consumer Content and [Service Provider] Content. [ALI] does not have any duty or obligation to investigate the accuracy of Consumer Content or the quality of the work performed by the [Service Provider] or any other Service Provider which is the subject of any Consumer Content.

(SPUA 9 (emphasis added); *see* FAC ¶ 25.)

ProWater also clarifies that "the . . . SPUAs have *no contract terms that allow [ALI] to charge its Service Providers for the leads* generated by . . . [being] listed on the [ALI] website." (*Id.* ¶ 35 (emphasis added).) Rather, Service Providers like ProWater pay ALI on a monthly basis "to be *listed* on the [ALI] website as a Service Provider *in the hopes of obtaining business leads* and new customers from [ALI] website users." (*Id.* ¶ 6 (emphases added).) ProWater alleges ALI has historically "provided a tremendous source of quality business leads." (*Id.* ¶ 12). But as noted, ProWater makes clear that Service Providers "do not expect to be charged by [ALI] for leads generated by the [ALI] website, as *there is no contractual agreement requiring the Service Providers to make any such per lead payments*." (*Id.* ¶ 47 (emphasis added).)

B.   **HomeAdvisor & AHI**

HomeAdvisor also operates an online platform similar to ALI's, through which users can find businesses for hire. (*See generally id.* ¶ 68–69, 71–72.) In contrast to the ALI advertising model, however, a business advertising itself on HomeAdvisor "*would* expect to pay per lead for the leads received from HomeAdvisor." (*Id.* ¶ 48 (emphasis added).)

AHI allegedly became the parent company of both ALI and HomeAdvisor sometime in 2017. (*See id.* ¶¶ 32, 36–37.) As ProWater puts it, "[ALI] and HomeAdvisor, companies that were former competitors, are now under the common

3

ownership of [AHI]." (*Id.* ¶ 37.) Consequently, ProWater claims, AHI receives financial benefits from the conduct at issue here, as its revenue comes from both ALI and HomeAdvisor. (*Id.* ¶¶ 41, 44). ProWater also alleges that AHI exerts pervasive operational control over ALI, such that the two companies function as alter egos. (*Id.* ¶¶ 96–104.)

### C.   Alleged Conduct

ProWater claims that ALI violated the two SPUA terms identified above by "surreptitiously" redesigning its website to send the personal information of its users and Service Providers to HomeAdvisor, in such a manner that enables ALI and HomeAdvisor to double charge Service Providers like ProWater for a single advertisement. (*See, e.g.*, *id.* ¶¶ 32, 43, 55, 62–63.) Specifically, ProWater alleges that when a consumer searches ALI's website for Service Providers, the consumer's search information is immediately sent to HomeAdvisor, and HomeAdvisor immediately sends the information to its own service providers in the form of leads, for which it charges a per-lead fee. (*See, e.g.*, *id.* ¶¶ 38–40, 55.) ProWater asserts that this system results in service providers like itself being double charged for a single advertisement on ALI's website (once by ALI for its subscription and again by HomeAdvisor for the lead). (*See, e.g.*, *id.* ¶¶ 55, 62.) ProWater also alleges that "without a concurrent subscription to HomeAdvisor's lead services . . . it appears that the term-based advertising . . . on the [ALI] website is useless." (*Id.* ¶ 81.)

Separately, ProWater alleges that when it decided to end its subscription with ALI, ALI removed ProWater's information from its website before ProWater's subscription had expired, and ALI charged ProWater for an additional month without listing ProWater on its website. (*Id.* ¶¶ 83–85.) ProWater claims it disputed that extra charge, which led to ALI threatening to send the debt to third-party collectors unless ProWater paid the bill or renewed its subscription with ALI. (*Id.* ¶¶ 86–88.)

Based on the above, ProWater asserts three causes of action, on behalf of itself and a putative class, against ALI and AHI for: (1) breach of contract; (2) fraudulent

misrepresentation; and (3) violation of California's Unfair Competition Law, California Business and Professions Code §§ 17200, *et. seq.* ("UCL"). (*See generally* FAC.) Now, ALI and AHI move to dismiss the FAC under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim. (*See* Mot.)

## III. EXTRANEOUS EVIDENCE

Before resolving the Motion, the Court notes that ProWater submitted a video to the Court on a USB-drive (the "Video"), plus numerous supporting declarations, purportedly to clarify the nature of Defendants' alleged conduct. (*See* Opp'n 2, ECF No. 39; *see also* ECF Nos. 39-1, 39-2, 39-3, 39-4, 40, 41, 43.) ProWater says it submitted the Video because its allegations are "hard to describe in writing" and "have a tendency to tax the imagination." (Opp'n 2.) As explained by ProWater, the Video demonstrates how a user's information entered into ALI's website is instantly transmitted to HomeAdvisor, who immediately sends the lead to its own service providers for a per-lead fee. (*See id.* 2–3.)

Defendants argue the Video and accompanying declarations "should be set aside and not considered," as they are procedurally improper and substantively irrelevant. (*See* Reply 2, ECF No. 42.) Without addressing whether the Video was properly filed as a matter of procedure, the Court notes that the Video does not provide any information not already included in the FAC, and even if it did, that information would not be considered a part of the FAC. In any event, because the Video merely demonstrates that which is already alleged in the FAC, and the Court accepts ProWater's well-pleaded allegations as true for purposes of this Motion, (*see* Part IV, *infra*), the Court does not rely on the Video or supporting declarations, nor would reliance thereon affect the Court's disposition of the Motion.

## IV. LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To

survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

"A party cannot amend pleadings to 'directly contradict an earlier assertion made in the same proceeding.'" *Airs Aromatics, LLC v. Op. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (brackets omitted) (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)); *see also Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990) ("[An] amended complaint may only allege 'other facts consistent with the challenged pleading.'" (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). "Where allegations in an amended complaint contradict those in a prior complaint, a district court need not accept the new alleged facts as true, and may, in fact, strike the changed allegations as 'false and sham.'" *Azadpour v. Sun Microsystems, Inc.*, No. C06-03272 MJJ, 2007 WL 2141079, at *2 n.2 (N.D. Cal. July 23, 2007) (citing *Litton Indus.*, 912 F.2d at 296).

Where a district court grants a motion to dismiss, it should provide leave to amend if the complaint could be saved by amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *see also* Fed. R. Civ. P. 15(a)(2) ("The Court should freely give leave when justice so requires."). Reasons to deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment." *Leadsinger, Inc. v. BMC Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (brackets omitted) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## V. DISCUSSION

Defendants move to dismiss ProWater's FAC for a failure to plead facts sufficient to support any cause of action. (*See* Mot.) In particular, they argue that (A) the UCL claim fails because the parties' relationship is governed by Indiana law and because ProWater fails to otherwise state a claim for relief under the UCL; (B) the contract claim fails because ProWater does not allege any breach; and (C) the fraud claim fails because ProWater does not allege any misrepresentation and because ProWater fails to otherwise meet the heightened pleading standard of Rule 9(b). (*Id.*) The Court addresses these issues, in that order, below.

### A. Choice of Law (& UCL Claim)

As a starting point, Defendants point to a choice-of-law clause in the SPUA (the "Clause"), which states:

> This Agreement *and the relationship between [ProWater] and [ALI]* will be governed by the internal laws of the State of Indiana, notwithstanding the choice of law provisions or conflict of law analysis of the venue where any action is brought, where the violation occurred, where the [Service Provider] may be located or any other jurisdiction.

(SPUA 14 (emphasis added).) ProWater appears to concede Indiana law governs its breach of contract claim. (*See* Opp'n 7.) Further, both parties appear to agree that the

7

fraudulent misrepresentation claim does not turn on whether California or Indiana law applies; thus, it matters not which law governs that claim. (Mot. 18; Opp'n 2; Reply 7.)

However, the parties dispute whether ProWater's UCL claim must be dismissed in light of the Clause. (*See* Mot. 21; Opp'n 16–18; Reply 8–10.) Indeed, "[a] valid choice-of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL." *Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006) (citing *Medimatch, Inc. v. Lucent Techs., Inc.*, 120 F. Supp. 2d 842, 862 (N.D. Cal. 2000)). Consequently, before testing the sufficiency of ProWater's claims (in particular, the UCL claim), the Court must determine which substantive law applies.[3]

"To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum." *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010) (citing *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005)). "California courts apply two different analyses for selecting which law should apply in an action," based on whether the parties have agreed to a choice of law in advance. *See Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 535 (C.D. Cal. 2013) (citing *Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 914–15 (2001)). Where the parties have entered into a contract that specifies another jurisdiction's law will govern their disputes (as is the case here), courts in California apply the framework set forth in *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459 (1992). *Gustafson*, 294 F.R.D. at 535.

---

[3] Both parties assert, albeit for different reasons, that the Court need not perform any choice-of-law analysis to resolve the Motion. (*See* Mot. 13; Opp'n 5–7; Reply 8.) The Court has carefully considered these arguments and finds them entirely unpersuasive. "Perhaps no legal subject has caused more consternation and confusion among the bench and bar than choice of law." *Chen v. L.A. Truck Ctrs., LLC*, 7 Cal. 5th 862, 867 (2019). But that is no reason to "simply pass[] over this distinct analytical question," *see ABF Capital Corp. v. Grove Properties Co.*, 126 Cal. App. 4th 204, 215 (2005), even if "choice-of-law issues . . . can be difficult, even arcane," *see JMP Securities LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1034 (N.D. Cal. 2012).

### *1.  Scope of the Clause*

"Under *Nedlloyd*, a trial court should first examine the choice-of-law clause and ascertain whether the advocate of the clause has met its burden of establishing that the various claims . . . fall within its scope." *Id.* (internal quotation marks omitted) (citing *Wash. Mut.*, 24 Cal. 4th at 916). "California, the forum state, ordinarily examines the scope of a choice-of-law provision in a contract under the law designated in that contract." *Narayan*, 616 F.3d at 898. Here, that is Indiana law. (*See* SPUA 14.)

In Indiana, "[p]arties may generally choose the law that will govern their agreements." *Hoehn v. Hoehn*, 716 N.E.2d 479, 484 (Ind. Ct. App. 1999). With respect to causes of action that do *not* arise from the parties' contractual agreement, "a choice-of-law provision 'will not be construed to govern tort as well as contract disputes *unless it is clear that this is what the parties intended*.'" *Ello v. Brinton*, No. 2:14-CV-299-TLS, 2015 WL 2340754, at *3 (N.D. Ind. May 13, 2015) (emphasis added) (quoting *Kuehn v. Childrens Hosp., L.A.*, 119 F.3d 1296, 1302 (7th Cir. 1997)); *accord Sheldon v. Munford, Inc.*, 660 F. Supp. 130, 134 (N.D. Ind. 1987) ("[B]efore applying the . . . test [to determine which law governs a non-contract claim], the court must determine whether the parties to the present contract have already chosen which state's law is to apply.").

Here, the parties agreed that Indiana law would govern not only the SPUA, but also "the relationship between [ProWater] and [ALI]." (SPUA 14). Based on this language, the Court finds the parties expressed a clear intent for Indiana law to govern contract *and* tort causes of action that arise out of the parties' relationship. *Cf. Ello*, 2015 WL 2340754, at *3 (finding no such intent where choice-of-law provision did *not* purport to reach beyond the parties' agreement); *WRM Am. Indem. Co., Inc. v. Siemens Bldg. Tech., Inc.*, No. 2:12-cv-73-WTL-WGH, 2012 WL 6045157, at *2 n.1 (S.D. Ind. Dec. 5, 2012) (same). Notably, this conclusion would also be the same under California law. *See, e.g., Melt Franchising, LLC v. PMI Enters., Inc.*, No. 08-4148 PSG (MANx), 2009 WL 32587, at 3 (C.D. Cal. Jan. 2, 2009) (holding

contractual provision that "the parties' rights under th[e] Agreement, and *the relationship between the parties* is governed by [Massachusetts law]" applicable to "any disputes, whether sounding in tort or contract law, which arose out of . . . the parties' business relationship" (emphasis added)). For these reasons, the Court concludes that all of ProWater's claims fall within the scope of the Clause.

### 2. *Enforceability of the Clause*

"Once a court determines that a claim falls within the scope of a choice-of-law clause, it must consider whether the clause is enforceable." *Gustafson*, 294 F.R.D. at 537 (citing *Wash. Mut. Bank*, 24 Cal. 4th at 916). California courts follow section 187(2) of the Restatement (Second) of Conflict of Laws, under which "the proponent of the choice-of-law provision bears the burden of showing that the chosen state 'has a substantial relationship to the parties or their transaction' or 'there is any other reasonable basis for the parties' choice of law.'" *Id.* "If either of these tests is met, the choice-of-law provision will be enforced 'unless the other side can establish both that the chosen law is contrary to a fundamental policy of California *and* that California has a materially greater interest in the determination of the particular issue.'" *Id.* (emphasis added).

#### a. <u>Substantial Relationship or Other Reasonable Basis</u>

Defendants satisfy their burden of showing a substantial relationship between Indiana and the case (as well as a reasonable basis for choosing Indiana law) because ALI's principal place of business is in Indiana. (*See* FAC ¶ 91; Mot. 14 (citing *Reddy v. Mediscribes, Inc.*, No. EDCV 19-1677 JGB (SPx), 2020 WL 2220202, at *3 (C.D. Cal. Feb. 18, 2020))); *see also* Restatement (Second) of Conflict of Laws § 187 cmt. f (Am. L. Inst. 1971) ("When the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice. This will be the case, for example, when this state is that where . . . one of the parties is domiciled or has [its] principal place of business."). Thus, the Clause shall be enforced unless ProWater can establish that Indiana law "is

contrary to a fundamental policy of California *and* that California has a materially greater interest in the determination of the particular issue." *See Gustafson*, 294 F.R.D. at 537 (emphasis added) (citing *Wash. Mut. Bank*, 24 Cal. 4th at 917); *Nedlloyd*, 3 Cal. 4th at 466.

### b. Contrary to a Fundamental Policy of California

Having found a substantial relationship between Indiana and the case, "the Court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties' choice of law." *Nedlloyd*, 3 Cal. 4th at 466. As to this issue, ProWater submits that Indiana's "closest statutory equivalent to the UCL" is the Indiana Deceptive Consumer Sales Act ("IDCSA"). (Opp'n 17 (citing Ind. Code § 24-5-0.5-3).) However, ProWater explains, the UCL and IDCSA are different in that "the UCL seeks to protect both competitors *and* consumers" whereas the "IDCSA only pertains to consumer transactions." (*Id.*) ProWater thus asserts that because it is not a "consumer" as defined in the IDCSA, it "would have no remedy for the alleged anti-competitive conduct of the Defendants under Indiana law," and Indiana law is therefore contrary to the fundamental policies underlying the UCL. (*Id.* at 18.) Problematically for ProWater, however, "[t]he mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Medimatch, Inc.*, 120 F. Supp. 2d at 862.

Moreover, ProWater's argument largely misses the issue. "Whether a [UCL] claim implicates fundamental California policy depends on the predicate violation." *Cardonet, Inc. v. IBM Corp.*, No. C-06-06637 RMW, 2007 WL 518909, at *5 (N.D. Cal. Feb. 14, 2007); *accord It's Just Lunch Int'l LLC v. Nichols*, No. EDCV 06-1127-VAP (OPx), 2009 WL 10668457, at *16 (C.D. Cal. May 21, 2009) ("Courts have differed on whether [the UCL] embodies a fundamental policy, depending on the underlying violation."). Relevantly, at least one court has found that a UCL claim

"did not implicate fundamental California policy so as to bar enforcement of [a] choice-of-law provision" because "enforcement of [the] provision *as to underlying fraud claim* would not implicate fundamental California policy." *See Cardonet, Inc.*, 2007 WL 518909, at *5 (emphasis added) (describing *Nibeel v. McDonald's Corp.*, 1998 WL 547286 at *11 (N.D. Ill. 1998) ("The policies underlying the [UCL] are essentially the same as those which support [plaintiff]'s tort claim . . . and are therefore insufficient to overcome the presumption for applying [another state's] law in this case.")).

Here, ProWater's UCL claim is clearly predicated on the same facts as those underlying its fraudulent misrepresentation claim. (*See* FAC ¶¶ 138–66.) But ProWater does *not* argue that applying Indiana law to its fraud claim would violate California fundamental public policy. (*See* Opp'n 16–18 (focusing expressly and exclusively on the policies underlying the UCL).) Because ProWater does not establish that Indiana law conflicts with a fundamental California policy regarding its *fraudulent misrepresentation* claim, the Clause dictates that Indiana law shall govern that claim. Similarly, as the policies underlying the UCL claim are essentially the same as those underlying the fraudulent misrepresentation claim, they are insufficient to overcome the presumption for applying Indiana law to the UCL claim in this case. *See, e.g.*, *Nibeel*, 1998 WL 547286, at *11.

In short, ProWater fails to establish that Indiana law conflicts with a fundamental California policy underlying ProWater's claims, and "[i]f there is no such conflict, the court shall enforce the parties' choice of law." *See Nedlloyd*, 3 Cal. 4th at 466.[4] Accordingly, the Court shall enforce the Clause by applying Indiana law to ProWater's claims.

Furthermore, because "[a] valid choice-of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL," the Court

---

[4] As ProWater fails to show a conflict between Indiana law and a California fundamental policy, the Court need not consider whether California has a materially greater interest in the determination of the issues and declines to do so.

**GRANTS** the Motion with respect to ProWater's UCL claim, which is **DISMISSED**. *See Cont'l Airlines*, 412 F. Supp. 2d at 1070 (citing *Medimatch*, 120 F. Supp. 2d at 862).[5]

## B.     Breach of Contract Claim

Next, the Court turns to ProWater's amended breach of contract claim. Under Indiana law, "the essential elements of any breach of contract claim are [1] the existence of a contract, [2] the defendant's breach thereof, and [3] damages." *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind. Ct. App. 1998). In this case, ProWater's contract claim is premised on two specific terms in the SPUA, which allegedly say that ALI will (1) refrain from sharing the personal information of its Service Providers with third parties (*see* SPUA 12); and (2) remain a "passive conduit" which does not review the content of what its users or Service Providers post on the ALI website (*see* SPUA 9). (*See also* FAC ¶¶ 24–25 (identifying the two "key representations" upon which ProWater bases its claims).) In particular, ProWater claims that Defendants breached both provisions by sharing its Service Providers' personal information with HomeAdvisor in the manner described in Part II, *supra*. (*See* FAC ¶¶ 125–26.)

Defendants move to dismiss this claim on the ground that ProWater fails to allege any breach, as the conduct alleged to have been a breach is expressly permitted by the parties' written agreement. (Mot. 15–17; Reply 3–6.) According to Defendants, ProWater *admits* all Service Providers must agree to ALI's Privacy Policy, and the Privacy Policy permits ALI to send Service Providers' contact information to anyone under common control with ALI (such as HomeAdvisor). (Mot. 15 (citing FAC ¶ 21; SPUA 4).)

ProWater objects to Defendants' characterization of Paragraph 21 of the FAC, which states that every Service Provider "appears to be required to agree with . . . the

---

[5] As operation of the Clause bars ProWater's UCL claim, the Court need not consider whether ProWater alleges facts sufficient to otherwise establish a claim under the UCL and declines to do so.

13

[ALI] Privacy Policy." (FAC ¶ 21.) ProWater strongly denies admitting it was bound by the Privacy Policy, explaining that "[a]ffirmatively stating one *has agreed* to a policy is vastly different than saying that one *appears to have been required to agree to a policy*." (Opp'n 8 (citing FAC ¶ 21).) Additionally, ProWater argues that the Privacy Policy applies only to ALI's users, not its Service Providers. (*Id.*) But ProWater's arguments are unavailing.

First, even accepting ProWater's semantic distinction regarding Paragraph 21 (a thin distinction at best), the remaining allegations still establish that ProWater agreed to ALI's Privacy Policy. ProWater attaches *three* copies of the Privacy Policy to the FAC.[6] The Privacy Policy states, "*By using the Site and Services you consent to the terms of this Privacy Policy. . . .* This Privacy Policy is part of our [ALI] Membership Agreement, Terms of Use, *and all other terms of using our Site and Services*." (Privacy Policy 1 (emphases added).) Furthermore, the FAC is replete with allegations that expressly or impliedly establish that ProWater used ALI's website and services as a Service Provider. (*See, e.g.*, FAC ¶¶ 6, 12, 16, 45, 79, 83, 124.) Consequently, read in conjunction with the Privacy Policy itself and absent *any* allegations to the contrary, the FAC plainly establishes that ProWater agreed to the terms of the Privacy Policy. (*See id.*) From there, the rest is simple. ProWater alleges that ALI and HomeAdvisor are under the common control of AHI. (*See, e.g., id.* ¶ 37.) And the Privacy Policy expressly carves out an exception for the conduct which ProWater identifies as a breach—namely, the transferring of Service Providers' contact information to HomeAdvisor. (*See* Privacy Policy 4 (stating that ALI "do[es] not disclose Personal Information to third parties, *except when . . . [t]he party to whom the disclosure is made . . . is under common control with [ALI]*" (emphasis

---

[6] The Privacy Policy is attached on its own as Exhibit C to the FAC, but it is also included within Exhibits A and B (the SPUAs). "Certain written instruments attached to pleadings may be considered part of the pleading." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citing Fed. R. Civ. P. 10(c)). "[T]he district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* Accordingly, the Court treats the Privacy Policy as part of the pleadings.

added))).) Accordingly, the Court concludes that ProWater fails to allege a breach of the first provision, which otherwise prohibits the sharing of personal information with unaffiliated third parties.

As to the second provision with the "passive conduit" language, little need be said. ProWater alleges that Defendants breached this clause by sharing contact information with HomeAdvisor, or by redesigning its website to accomplish this sharing. (FAC ¶¶ 125–26.) Defendants contend the "passive conduit" language in the SPUA "is simply a disclaimer concerning how [ALI] will treat (a) ratings and reviews . . . submitted by a consumer . . . and (b) content directed to consumers submitted by service providers." (Mot. 19.) Having reviewed the plain language of the clause in question, the Court agrees. The "passive conduit" clause invoked by ProWater simply does not concern the sharing of contact information with third parties; rather, it is a disclaimer that ALI does not review the content (e.g., reviews, ratings, responses) that users or Service Providers post on the website. (*See* SPUA 9.) Even taking the allegations as true, Defendants' conduct does not constitute a breach of the SPUA provision in which the "passive conduit" language is found.

Thus, the Court ultimately concludes that ProWater fails to allege a breach of either SPUA term identified in the FAC, thereby failing to adequately allege a claim for breach of contract. *See Holloway*, 695 N.E.2d at 995. Before moving on, however, the Court is compelled to highlight what it perceives to be the most glaring flaw in ProWater's allegations.

Upon review of the record, it is readily apparent that the SPUA is *not* itself the advertising agreement between ProWater and ALI, yet ProWater is attempting to hitch a purported breach of the *advertising agreement* to the duties arising under the *SPUA*. (*See, e.g.*, FAC ¶ 127.) In doing so, ProWater fails to allege the *terms* of the advertising agreement and any *breach* of the SPUA. Tellingly, ProWater attempts to save its contract claim by pointing to Paragraphs 43, 81, 84, and 122–23, each of which includes conclusory reference to some unidentified advertising agreement—not

the SPUA—under which ProWater paid ALI a monthly fee. (*See* Opp'n 10.) But the Court cannot determine from the FAC what ALI's obligations were under that advertising agreement; consequently, the Court cannot determine whether ALI's conduct constituted any breach. (*Compare* FAC ¶¶ 6, 12 (indicating that ALI provided ProWater with customer leads), *with id.* ¶¶ 35, 47 (clarifying that ProWater was under no obligation to pay ALI per customer lead).) Even more tellingly, ProWater asserts that "through no fault of its own, *[ProWater] does not presently have access to the written document at issue* [i.e., the advertising agreement]." (Opp'n 11 (emphasis added).) Indeed, this statement only further confirms that the contract ProWater claims to place at issue (the advertising agreement) is not the contract it submitted to the Court (the SPUA). (*Id.*) In other words, the Court does not have access to the relevant contract, either.

For these reasons, the Court concludes that the FAC does not set forth facts sufficient to establish a cognizable theory for breach of contract. The Motion is **GRANTED** with respect to ProWater's breach of contract claim, which is **DISMISSED**.

### C. Fraudulent Misrepresentation Claim

Lastly, the Court turns to ProWater's claim for fraudulent misrepresentation. Under Indiana law, a claim for actual fraud requires the plaintiff to prove: "(1) a material misrepresentation of past or existing facts; (2) made with knowledge or reckless ignorance of falsity; (3) causing the claimant to rely upon the misrepresentation to the claimant's detriment." *Am.'s Directories Inc., Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1067 (Ind. Ct. App. 2005).[7] Additionally, under Rule 9(b), a party alleging fraud or mistake must state "with particularity the time, place, and manner of each act of fraud, plus the role of each

---

[7] The elements for a fraudulent misrepresentation claim are similar under California law. *See Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173 (2003) ("The elements of fraud . . . are (a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity . . . ; (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.").

defendant in each scheme." *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991) (citing Fed. R. Civ. P. 9(b)).

Defendants move to dismiss this claim on the grounds that (1) ProWater fails to allege a false or misleading statement, and (2) ProWater fails to meet the heightened pleading standard of Rule 9(b). (Mot. 18–19.) Defendants also contend that ProWater impermissibly repackages its breach of contract claim in the form of a fraud claim, and that consequently, the fraud claim suffers from the same deficiencies as the contract claim. (Mot. 17–18.) In opposition, ProWater maintains that its contract and fraud claims are distinct (Opp'n 15), and that Rule 9(b) does not require the level of "granular specificity" for which Defendants advocate (Opp'n 1–2). The Court need not consider whether the Rule 9(b) standard is met, however, because Defendants are correct that ProWater fails to adequately allege a false representation.

"[A] claimant who brings both a breach of contract and a fraud claim must prove that (1) the breaching party committed the separate and independent tort of fraud; and (2) the fraud resulted in injury distinct from that resulting from the breach." *Am.'s Directories*, 833 N.E.2d at 1067. This is because "[a] breach of contract claim may not lead to an award of punitive damages." *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App. 2004) (citing *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975, 984 (Ind. 1993)). Consequently, a fraud claim fails as a matter of law when it is "merely a repackaged version of [a] breach of contract claim." *See id.*

Here, ProWater unambiguously premises its fraud claim on the same two SPUA provisions identified in its contract claim: (1) the representation that Angie's List would not sell, trade, rent or share ProWater's Private Information with any third parties; and (2) the representation that Angie's List and was simply a passive conduit. (*See* FAC ¶¶ 24–30 (citing SPUA 9, 12).) Indeed, "the allegations making up [ProWater's] fraud claim amount to a series of misrepresentations stemming from and about the contract itself." *See Tobin*, 819 N.E.2d at 86. This is not permitted.

Moreover, the fraud claim fails for the same reasons that compel dismissal of the contract claim, as detailed above. (*See* Part V(B), *supra*.) Indeed, ProWater fails to allege a false misrepresentation for the same reasons it fails to allege a breach of the SPUA. The Court need not parrot those deficiencies again. Simply put, ProWater does not allege facts sufficient to show that either of the two SPUA provisions identified by ProWater were materially false. Accordingly, the Motion is **GRANTED** as to the claim for fraudulent misrepresentation, which is also **DISMISSED**.

### D.  Leave to Amend

Without offering any suggestions for how it might amend its claims in the event they are dismissed, ProWater requests leave to amend and concedes that "a few of its claims in the FAC may need further elaboration." (Opp'n 24.) Because the Court cannot say that any amendment would be futile, leave to amend is appropriate in this case. *See Manzarek*, 519 F.3d at 1031. However, considering the serious deficiencies identified above, the Court is compelled to clarify what this means, lest there be further confusion. ProWater may *not* reassert a breach of contract claim or fraud claim premised on the same two SPUA provisions, as such an amendment would be futile. The Court is highly skeptical that any amendment could save the UCL claim, but if ProWater does attempt to reallege a UCL claim, it must, at minimum, rectify the deficiencies identified in this Order. Subject to these restrictions, ProWater is **GRANTED leave to amend.**

## VI.  CONCLUSION

In summary, the Court **GRANTS** Defendants' Motion. (ECF No. 36.) The FAC is **DISMISSED** in its entirety **with leave to amend**. To the extent the Court grants leave to amend, ProWater may file a Second Amended Complaint curing the deficiencies identified above within **twenty-one (21) days** of the date of this Order. If ProWater timely files an amended complaint, Defendants must file their response(s) in

//

//

accordance with Rule 15(a)(3). Failure by ProWater to timely amend will result in dismissal with prejudice and closing of this case.

**IT IS SO ORDERED.**

January 13, 2021

```
                          _____
                              OTIS D. WRIGHT, II
                           UNITED STATES DISTRICT JUDGE
```