**O**

# United States District Court
# Central District of California

PRO WATER SOLUTIONS, INC.,

               Plaintiff,

      v.

ANGIE'S LIST, INC. et al.,

               Defendants.

Case № 2:19-cv-08704-ODW (PLAx)

**ORDER DENYING PLAINTIFF'S MOTION TO CERTIFY CLASS [81]**

## I. INTRODUCTION

Plaintiff Pro Water Solutions, Inc. brings this putative class action against Defendants Angie's List, Inc. ("Angie's List") and Angi Homeservices Inc. ("Angi") on behalf of itself and others who advertised their businesses on Angie's List's website. (*See* Second Am. Compl. ("SAC"), ECF No. 52.)  Defendants removed this case from the Superior Court of California, County of Los Angeles to the Central District of California on the basis of Class Action Fairness Act jurisdiction.  (Notice of Removal ¶¶ 8–37, ECF No. 1.)  Presently before the Court is Pro Water's Motion to Certify Class, (Mot. Certify ("Motion" or "Mot."), ECF No. 81), which, for the following reasons, is **DENIED**.[1]

---

[1] After carefully considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. FACTUAL BACKGROUND

Pro Water is in the business of providing water treatment services, and this case arises from its efforts to market its services by advertising on Angie's List. Angie's List operates a website that homeowners[2] use to locate, evaluate, contact, hire, and rate businesses for various contracting jobs. (SAC ¶ 4.) From 2011 to 2019, Pro Water was a registered business, or service provider, with Angie's List. (*Id.* ¶ 16.) During this time period, Pro Water also paid nonparty HomeAdvisor, Inc. to generate leads—that is, to send it the contact information of homeowners who were seeking water treatment services in exchange for a per-lead fee. (*See* SAC ¶ 75.)

Until recently, Angie's List and HomeAdvisor were two separate companies. After a series of corporate transactions in 2017, Angie's List and HomeAdvisor both became subsidiaries of a newly created corporate entity, Angi. (*See id.* ¶¶ 52–57.) Even after this merger, Angie's List and HomeAdvisor continue to function as separate platforms providing distinct services to homeowners and service providers. (Traughber Decl. ¶¶ 48–51.) To help clarify the role of each business in this controversy, the Court continues to refer to Angie's List and HomeAdvisor as two separate entities.

### A. Angie's List

Early iterations of Angie's List functioned like an enhanced digital Yellow Pages. (*See* SAC ¶ 107 (drawing this comparison).) Homeowners paid Angie's List for access to the "Directory," a database of service providers such as Pro Water. (Traughber Decl. ¶ 3.) For each participating service provider, the Directory, which is still a part of the Angie's List website, contains a description of the services a service provider offers, a compendium of reviews of the service provider written by other Angie's List homeowners, and a method by which homeowners can contact the service provider for more information or to hire the service provider. (*See id*. ¶¶ 6–7.)

---

[2] Consumers other than homeowners did and do use Angie's List, but to avoid potential confusion over the use of the word "consumers," the Court refers to those who visit Angie's List seeking to pay service providers to perform tasks as "homeowners." (*See* Decl. Chase Traughber ("Traughber Decl.") ¶ 2, ECF No. 84-5.)

Angie's List does not charge service providers to be listed in the Directory, but service providers have the option to pay a fee to advertise in the Directory.  (*Id.* ¶¶ 4–5.)  Specifically, a service provider can enter into an annual contract with Angie's List and pay a monthly fee in exchange for Angie's List's (1) giving the service provider featured placement in the Directory, and (2) displaying the provider's "coupons" to homeowners viewing the Directory.  (*Id.* ¶¶ 5, 9; SAC ¶ 27.)  "Coupons" are special offers available to homeowners who engage service providers through Angie's List.  (SAC ¶ 99.)  An advertiser's purchase of a coupon on Angie's List is roughly analogous to purchasing ad space in a traditional Yellow Pages: with both, the service provider pays money to the owner of the directory for featured placement.

In 2019, Angie's List began giving service providers entering into new advertising contracts "express guidance," or estimates, regarding the number of "contacts" the service provider could expect to receive from homeowners during the first ninety days of advertising.  (Opp'n Mot. Certify Class ("Opp'n") 16, ECF No. 84; Traughber Decl. ¶ 16; *see* Decl. Joseph Duffy ("Duffy Decl.") Ex. A (Dep. Jeremy Michael Stewart ("Stewart Dep.")) 65:2-8, ECF Nos. 84-1, 84-2 ("The way the business operated changed over time.  Initially, Angie's List advertisers would pay the company . . . to appear in the directory.  Over time we shifted to try to tie the amount of advertising spend that an Angie's List service professional had to the amount of contact that they received.").)  A "contact" on Angie's List occurs when a homeowner reaches out to a service provider about a project, whether by viewing the Directory, claiming a coupon deal, using the SR Path (discussed below), or otherwise.  (Traughber Decl. ¶ 14.)  Each of these actions counts as a "contact," whether or not the homeowner eventually hires the service provider.  (*Id.* ¶ 15.)

Angie's List began providing estimates around the same time it introduced a tiered pricing scheme, under which service providers could pay a higher monthly fee for more prominent Directory placement and a higher estimated number of contacts.  (*Id.* ¶¶ 12–13.)

**B.    HomeAdvisor**

HomeAdvisor's business model differs fundamentally from that of Angie's List. Whereas Angie's List generates revenue by charging (1) homeowners for Directory access and (2) service providers for advertising space, HomeAdvisor generates revenue by attracting homeowners to its website and then converting those homeowners to individual leads for paying service providers.  (*See* Stewart Dep. 47:1–7; SAC ¶ 56.) HomeAdvisor charges service providers a fee per lead; the service provider receives the homeowner's contact information and has the option to contact the homeowner about the job.  (*See* SAC ¶¶ 60, 75–77; Stewart Dep. 51:4–12 ("Angie's List advertising service professionals would pay . . . a fixed non-variable fee every month, and would receive contact volume and a number of contacts without a change in that price, whereas HomeAdvisor service professionals would pay on a per-lead basis . . . .").)

**C.    SR Path**

In 2018, after the merger of Angie's List and HomeAdvisor, Angie's List introduced a new feature to its website: the SR Path.  The SR (or "Service Request") Path was, and still is, an alternate way for homeowners to find suitable service providers for their projects.  (Traughber Decl. ¶ 27.)  Defendants explain that Angie's List introduced SR Path because previously, Angie's List's website required homeowners to sign up for an account to access the Directory and contact service providers.  (*See id.* ¶ 3.)  Defendants explain that website visitor behavior had changed such that homeowners were increasingly less likely to go to the trouble of creating an account and would thus "bounce off"—that is, they would visit the Angie's List homepage but ultimately elect not to create an account or log in.  (*See* Opp'n 7.)  Angie's List was losing customers as a result of this behavior, and it introduced SR Path to provide "a lower friction way for consumers to fill out information and be matched to service professionals."  (Stewart Dep. 37:14–16.)

The SR Path is available on the Angie's List homepage for any visitor to use, without the need to create an account or pay a fee.  (Traughber Decl. ¶¶ 27–28.)  A

homeowner experiences the SR Path as a page or a pop-up in which the homeowner provides their contact information and answers a series of questions regarding the nature and timing of their project. (*Id.* ¶ 31.) Based on this information, the SR Path provides up to four "results"—that is, four suggested service providers. (*Id.*) The homeowner is then presented the option to contact the service provider.

Angie's List does not charge service providers any separate fee for appearing in the search results of the SR Path; the SR Path was simply one of the several ways Angie's List connected service providers to homeowners in exchange for the service providers' periodic payments. (*See* Stewart Dep. 188:4–24.)

Defendants assert that the SR Path effectively serves it purpose; they attribute the increase in overall contacts to service providers on the Angie's List website—30% year-over-year in some instances—at least in part to the SR Path. (Duffy Decl. Ex. B ("Traughber Dep. ISO Opp'n") 231:1–24, ECF No. 84-3.) Relatedly, over time the SR Path has become the primary means by which Angie's List service providers receive contacts, increasing from about 33% of all contacts to around 65% in 2020. (Decl. Paul Cullen ("Cullen Decl.") Ex. A ("Stewart Dep. ISO Mot.") 189:25–190:23, ECF Nos. 81-2, 81-3; Cullen Decl. Ex. B ("Traughber Dep. ISO Mot.") 255:7–256:6, ECF No. 81-4.) Correspondingly, Angie's List has made certain changes to its website to emphasize the SR Path and de-emphasize the Directory. For example, in the past, the SR Path search results page—the one that listed the four recommended service providers for the homeowner—provided a link to the Directory below the search results. In March 2021, Angie's List removed that link, meaning that homeowners on the SR Path could no longer switch directly to viewing the Directory instead. (Traughber Decl. ¶ 34.)

In contrast to Defendants' assertions that the SR Path increased overall contacts to service providers, one of Pro Water's contentions in this suit is that the SR Path diverted homeowners away from the Directory and thus interfered with the effectiveness of its advertising spend with Angie's List. (*See* SAC ¶ 113.)

## D.      Dual Advertisers; Shared SR Path Search Results

During the times relevant to this lawsuit, Pro Water was a "dual advertiser"—that is, it paid Angie's List periodic fees to advertise there, and it also paid HomeAdvisor lead generation fees on a per-lead basis. (Mot. 7–8.) Because of its role as a dual advertiser, Pro Water learned that, after the merger, Angie's List and HomeAdvisor began to coordinate their activities such that the search results on Angie's List's SR Path did not consist entirely of Angie's List service providers (that is, service providers paying Angie's List periodic advertising fees). Instead, up to three of the four SR Path search results could be *HomeAdvisor* service providers (that is, service providers paying HomeAdvisor for homeowner contact information on a per-lead basis). (Traughber Decl. ¶ 32.) When a HomeAdvisor service provider appeared in the SR Path search results, Angie's List would transmit the contact information of the searching homeowner to HomeAdvisor, who would then transmit that information to the service provider that appeared in the results. The service provider would then pay HomeAdvisor for the lead. (Traughber Dep. ISO Opp'n 109:1–25.) To be clear: Angie's List service providers who appeared in SR Path did *not* receive the contact information of the searching homeowner; Angie's List service providers paid Angie's List fees for advertising and featured placement on the Angie's List website, *not* for the contact information of homeowners who were potential clients.[3] (*See* Decl. Brad Belnap ¶¶ 29–33, ECF No. 81-11.)

Not all categories of service provider on Angie's List corresponded to a category of service provider on HomeAdvisor, so there were instances where an SR Path's search results showed no HomeAdvisor service providers whatsoever (because no such providers existed in the category being searched). (Traughber Decl. ¶ 39.) Similarly,

---

[3] The record on this point is somewhat muddled, but it appears that, at least conceptually, the SR Path is a distinct feature from Angie's List's "Request-A-Quote" feature, which it introduced to its site in 2018. (Traughber Decl. ¶ 14.) The Request-A-Quote feature allows homeowners to submit information about their jobs to service providers and obtain individualized quotes for the jobs. Angie's List service providers whom homeowners contact using the Request-A-Quote feature <u>do</u> receive the homeowner's contact information. (Traughber Dep. ISO Opp'n 265:5–15.)

if HomeAdvisor had a corresponding category of service provider but could not provide suitable possibilities based on the parameters the homeowner entered into the SR Path, the search results would display only providers from Angie's List.  (*Id.* ¶ 33.)

Dual-advertiser service providers such as Pro Water who contracted with both Angie's List and HomeAdvisor were subject to a unique wrinkle in this process that the parties refer to as double-dipping or double-charging.  Specifically, when a dual advertiser service provider appeared in the SR Path search results and a homeowner contacted that service provider, HomeAdvisor would charge that service provider a lead generation fee.  (Traughber Dep. 149:12–150:24 ISO Opp'n.)  From the service provider's perspective, the service provider was being charged twice—once to advertise on Angie's List to appear in that homeowner's SR Path search results, and then again by HomeAdvisor for the lead generated by the provider's appearance in that same homeowner's SR Path search results.  (*Id.*; *see* Mot. 7.)  Defendants assert that a "robust" refund process was available for dual advertisers who had been double charged in this way.  (Traughber Dep. ISO Opp'n 148:18–149:9, 150:1–6; Traughber Decl. ¶ 37.)  Pro Water disagrees; its rebuttal is based on the experience of a former Angie's List employee who declares that many service providers contacted her because of problems with the refund process.  (Decl. Amber Stewart ¶¶ 10–14, ECF No. 93-11.)  When the former employee tried to raise the issue, management threatened her with write-ups and termination.  (*Id.* ¶¶ 15–16.)

## III.   PROCEDURAL BACKGROUND

Based on the foregoing facts, Pro Water asserts that Angie's List breached contracts and violated statutes by engaging in five principal categories of conduct: sharing Pro Water's information with HomeAdvisor; introducing SR Path onto the Angie's List website; including HomeAdvisor service providers in the SR Path search results; leading service providers to believe that the only way they could appear in the SR Path search results was by advertising through Angie's List; and double-charging

dual advertisers.[4]   Pro Water's Complaint asserted four claims variously aimed at obtaining relief for these alleged wrongs.   After three rounds of motions to dismiss and amended pleadings, what remains is a single claim for "unfair" business acts or practices under the California unfair competition law ("UCL"), Business and Professions Code section 17200.   The allegations pertaining to the first category of conduct—Angie's List's sharing Pro Water's information with HomeAdvisor—related principally to contract claims which are now dismissed.   The remaining basis for the UCL claim is Angie's List's introducing and maintaining the SR Path on its website, corresponding to the remaining four categories.

On April 15, 2022, Plaintiff moved for class certification, seeking certification of the "California Class," defined as all California-based service providers who paid to advertise on Angie's List's website during the limitations period, and the "California HomeAdvisor Subclass," defined as any member of the California Class who is also a dual advertiser with HomeAdvisor.  (Mot. 1.)

### IV. LEGAL STANDARD

Class certification is appropriate only if the parties demonstrate each of the four requirements of Federal Rule of Civil Procedure ("Rule")23(a) and at least one of the requirements of Rule 23(b).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14, 621 (1997).   Under Rule 23(a), a class action is certifiable only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); *see, e.g.*, *Allen v. Verizon Cal., Inc.*, No. SACV 08-0774 DOC (MLGx), 2010 WL 11583099, at *2–4

---

[4] The Court omits discussion of the contract claim that is unique to Pro Water.  The Court previously found that portion of the contract claim to be well-pleaded, but that claim relates to Pro Water's allegation that Angie's List improperly charged it for a month of advertising services without providing those services.  (Order Mot. Dismiss SAC 13–14, ECF No. 59.)  That claim is unique to Pro Water and is not a part of the present Motion.

(C.D. Cal. Aug. 12, 2010) (considering the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a)).

As for Rule 23(b), Pro Water relies solely on Rule 23(b)(3), which states that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see, e.g.*, *Allen*, 2010 WL 11583099, at *4–11 (considering the predominance and superiority requirements of Rule 23(b)(3)).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[a] party seeking class certification must affirmatively demonstrate . . . compliance with the Rule," *id.*, by a preponderance of the evidence, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). When faced with conflicting or insufficient evidence on the issue of class certification, courts must "judge the persuasiveness and not merely the admissibility of evidence bearing on class certification." *Henson v. Fid. Nat'l Fin. Inc.*, 300 F.R.D. 413, 417 (C.D. Cal. 2014) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). This "may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Dukes*, 564 U.S. at 351).

"[A] court's class-certification analysis must be 'rigorous' . . . .'" *Id.* at 465. This is true of analysis under Rules 23(a) and 23(b) alike. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013), *cert denied*, 578 U.S. 1023 (2016). Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466. If the court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class within

the framework of Rule 23. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

## V. EVIDENTIARY OBJECTIONS

As part of its Reply, Pro Water raises objections to evidence supporting Defendants' opposition. (Pl.'s Obj., ECF No. 93-1.) The Court took the matter under submission one week after Pro Water filed its Reply and objections, which was also one week before the hearing on the Motion was scheduled to take place. (*See* ECF No. 94.) Then, on May 23, 2022, two weeks after the Reply was filed and on the day the hearing would have taken place, Defendants filed a response to Pro Water's evidentiary objections, along with objections of its own to evidence supporting Pro Water's reply. (Resp. Obj., ECF No. 95; Defs.' Obj., ECF No. 96.)

Defendants' materials are untimely. The Court assumes solely for the purpose of argument that it is permissible to submit materials in rebuttal to a reply; even so, in the absence of a Court order or request for permission, filing such materials two weeks after the reply itself was due, and one week after the Court has already taken the matter under submission, is considered untimely. *See Phuong Bich Dzuong v. Deutsch Bank Nat'l Tr. Co.*, No. SACV 16-536-JLS (KSx), 2016 WL 11000445, at *1 (C.D. Cal. June 23, 2016) (striking untimely brief); *cf. Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002) ("The district court has considerable latitude in managing the parties' motion practice and enforcing local rules that place parameters on briefing."). For this reason, the Court **STRIKES** Defendants' objection-related materials. (ECF Nos. 95, 96.)

Pro Water's objections are more in the character of procedural requests to strike evidence than evidentiary objections. First, Pro Water objects to the Declaration of John Borgo, Angi's Vice President of Product/Strategy Analysis, and the attachments thereto (together, the "Borgo Materials"), on the grounds that Defendants failed to identify Borgo sufficiently in advance of the class certification deadline to allow Pro Water to depose him. Pro Water fails to show prejudice arising from Defendants' delay,

and accordingly, Pro Water's objections are **OVERRULED**.  Pro Water further objects to the attachments to the Traughber Declaration, on the grounds that Defendants produced them untimely.  Pro Water likewise fails to show prejudice and this objection is **OVERRULED**.

## VI. DISCUSSION

The following discussion applies primarily to certification of the Class.  The Court addresses certification of the Subclass at the end of this section.

**A.    Theory of UCL Claim; Restitution Model**

As a preliminary matter, as discussed above, following the settling of the pleadings, Pro Water's case proceeds on one claim—unfair conduct under the California UCL—and four principal theories: that Angie's List (1) introduced SR Path onto its website, (2) included HomeAdvisor service providers in the SR Path search results, (3) caused service providers to believe that the only way they could appear in the SR Path search results was by advertising through Angie's List; and (4) double-charged dual advertisers.  Preliminarily, Pro Water's Motion does not clearly identify which of these theories forms the basis of its bid for class certification.   To make this determination and properly distill the class certification inquiry, the Court looks to Pro Water's proposed restitution model.  Pro Water provides the following example of its restitution model:

> Assume that an Angie's List [Service Provider] (i.e., one of the CA class members) receives 100 contacts from advertising on the Angie's List website in any given month. Assume also that half of those contacts came from the SR [P]ath and the other half from other aspects of the Angie's List website, such as the directory. *If half of the jobs coming from the SR [P]ath overall were directed to HomeAdvisor service professionals, that means that half of the opportunities to obtain a contact were taken away from the hypothetical Angie's List [Service Provider].* That Angie's List Service Provider advertiser should have been provided an additional 50 contacts in that given month, but for the fact that Defendants gave those opportunities instead to HomeAdvis[o]r advertisers. That, in this hypothetical, results in a 1/3 devaluation of the Angie's List Service [Provider's] advertising

1  spend. Utilizing this method, the actual number of contacts received by
2  Angie's List [Service Providers], and the corresponding number of
   contacts that were essentially directed to HomeAdvis[o]r advertisers, one
3  can compute the dilution of advertising spending on a classwide basis.

4  (Mot. 21–22 (emphasis added).)  The italicized language is key and demonstrates that

5  Pro Water's restitution model is meant to put Angie's List service providers in the place

6  they would have been had the SR Path search results consisted entirely of Angie's List

7  service providers.  Moreover, Pro Water's restitution model has two numerical inputs.

8  The first input is the percentage of a service provider's contacts that came from SR Path

9  (as opposed to the Directory), and the second input is the percentage of SR Path search

10 results that displayed Angie's List service providers.

11        Based on these observations, it is clear that the restitution model is based solely

12 on the theory that Defendants engaged in unfair business practices by including

13 HomeAdvisor service providers in the SR Path search results—theory number (2), and

14 only theory number (2), as designated above.  To be very clear on this point: the

15 restitution model does not attempt to address the double-charging problem unique to

16 the Subclass, nor does it attempt to address any of the other unfair conduct Pro Water

17 ascribes to Angie's List.  Thus, Pro Water seeks certification on one and only one of its

18 theories: that Defendants treated the entire Class unfairly by allowing HomeAdvisor

19 service providers to appear in the SR Path search results on the Angie's List website.

20 With the benefit of a clear understanding of the nature of the claim Pro Water seeks to

21 certify, the Court proceeds to consider whether certification is appropriate.

22 **B.    Commonality**

23        "To take advantage of Rule 23's procedure for aggregating claims, plaintiffs

24 must . . . establish 'there are questions of law or fact common to the class' . . . ." *Olean*,

25 31 F.4th at 663 (citing Fed. R. Civ. P. 23(a)).  "A common question 'must be of such a

26 nature that it is capable of classwide resolution—which means that determination of its

27 truth or falsity will resolve an issue that is central to the validity of each one of the

28 claims in one stroke.'"  *Id.* (quoting *Dukes*, 564 U.S. at 350); *Tyson Foods, Inc. v.*

*Bouaphakeo*, 577 U.S. 442, 453 (2016) ("[A] common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." (internal quotation marks omitted)).  "By contrast, an individual question is one where members of a proposed class will need to present evidence that varies from member to member."  *Olean*, 31 F.4th at 663 (citing *Bouaphakeo*, 577 U.S. at 453).  "What matters to class certification . . . is not the raising of common 'questions' . . . but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Dukes*, 564 U.S. at 350.

Pro Water asserts, and Defendants do not contest, that the sole potential common question this putative class action presents is whether Defendants' conduct was "unfair" under the California UCL.  (Mot. 16 ("[W]hether this is an 'unfair' business practice is a central question for every class member, and the answer will not differ based upon each class member's experience."); Opp'n 13 ("Plaintiff proffers a single 'common' question which is also the ultimate mixed question of law and fact in this case . . . ."); *see* Reply 3–8, ECF No. 93.)

Proceeding with this sole potential common question, the Motion fails on the commonality requirement because (1) variations among Class members change the outcome of the "unfair" analysis; (2) the Subclass is uniquely positioned and shares no common questions with the Class; and (3) Pro Water's claim is unmeritorious as a matter of law.

  1. *Variations among Class members with respect to "unfairness"*

First, multiple types of variations among Class members create differences in the outcome of the "unfair" analysis under the California UCL, defeating commonality.

Pro Water asserts, and Defendants do not contest, that case law provides two tests for determining whether a business practice is "unfair" in this case: the "public policy" test and the "balancing" test.  *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,

20 Cal. 4th 163, 186–87 (1999).  Under the "public policy" test, a plaintiff must show "that a practice violates public policy as declared by 'specific constitutional, statutory or regulatory provisions.'"  *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1205 (2010) (quoting *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (2002)).

Here, although Pro Water suggests that its claim passes muster under either test, (Mot. 16), Pro Water fails to substantiate its suggestion that the public policy test applies.  First, Pro Water asserts that Angie's List's conduct is unfair under the public policy test because Angie's List violated antitrust laws.  (Reply 5.)  But Pro Water does not elaborate on the nature of those antitrust violations; instead, it merely proffers the self-reinforcing assertion that, because the UCL is directed toward enforcement of antitrust laws, a claim based on the UCL must inherently be based on the public policy set forth in antitrust laws.  In making this argument, Pro Water suggests that *any* UCL violation is necessarily also a violation of substantive antitrust law.  The Court rejects this suggestion and correspondingly rejects Pro Water's argument.  *See Gregory*, 104 Cal. App. 4th at 854 (requiring plaintiff to "tether[]" UCL claim based on violation of public policy to "specific constitutional, statutory or regulatory provisions").

Pro Water further asserts that Angie's List's behavior is unfair under the public policy test because Angie's List violated "the laws this Court cited in ruling on Defendants' third motion to dismiss."  (Reply 5.)  Yet Pro Water does not actually identify any of the laws the Court purportedly cited.  It is Pro Water's burden to provide the Court with enough information about its theory of unfairness for the Court to make a reasoned judgment about class certification.  Pro Water fails in this burden with respect to the public policy test.

This leaves the balancing test.  Under the balancing test, a UCL plaintiff demonstrating unfair conduct must show that the harm to the consumer outweighs the utility of the practice.  *Rubio*, 613 F.3d at 1205 (citing *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735–36 (9th Cir. 2007)).  "The test of whether a business practice is unfair 'involves an examination of [the practice's] impact on its alleged victim,

balanced against the reasons, justifications and motives of the alleged wrongdoer.'" *S Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999).[5]

Here, Pro Water contends that the question of UCL unfairness can be resolved in one stroke for the entire Class. The Court disagrees and finds that UCL unfairness is not a common question.

First and foremost, service providers who were given estimates regarding their expected number of contacts are in a fundamentally different position with respect to the unfairness of Angie's List's conduct when compared to those who were not. As discussed, the theory on which Pro Water seeks certification is that Angie's List acted unfairly by allowing HomeAdvisor service providers to appear in the SR Path search results, and that Angie's List service providers lost contacts as a result of this practice. But where an Angie's List service provider was given an express estimate of the number of contacts it would receive as part of its contractual relationship with Angie's List, analysis of the fairness of Angie's List's conduct fundamentally changes.

Certainly, service providers who exceeded their estimates, on one hand, and those who fell short of their estimates, on the other hand, are not similarly situated with respect to UCL unfairness. The issue is whether the question "[d]oes the harm to service providers outweigh the utility of the practice?" will generate common answers across the Class. *Rubio*, 613 F.3d at 1205. But Angie's List service providers whose actual contacts exceeded the estimate have significantly *less* a basis than other Class members for arguing that they were harmed *at all* by the practice. Regardless of how Angie's List sources its SR Path search results, such a service provider appears to have received the benefit of its bargain with Angie's List. Such a service provider likewise has a weak

---

[5] Some courts recognize a second element to the balancing test. In addition to requiring the plaintiff to show that the harm to the consumer outweighs the utility of the practice, these courts further require that the plaintiffs show that the practice is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to the consumer." *See Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010). Regardless, the Court need not make this legal determination; as discussed herein, certification fails because the first element generates commonality and predominance problems without reference to the putative second element.

basis for arguing that the practice has little utility; if the Angie's List platform is working well and a service provider is receiving contacts as estimated, that service provider cannot meaningfully argue that one isolated aspect of the platform does not have utility.

Conversely, Angie's List service providers whose actual contacts *fall short of* the estimate have an entirely different argument with respect to fairness. Service providers aggrieved in this manner have a significantly stronger basis for arguing that including HomeAdvisor service providers in SR Path search results harmed the aggrieved provider in a way that outweighed the utility of the practice to Angie's List.

Moreover, the service providers in these two categories—those whose estimates were met, and those whose estimates were not met—stand in a fundamentally different position with respect to fairness when compared to service providers who never received any estimates at all. Such service providers are unable to point to estimates to tether their fairness argument to any sort of express criteria. These service providers would be left to argue unfairness based on other factors altogether, fundamentally changing the analysis and its result. The percentage of service providers who received estimates from Angie's List is nontrivial and carves out a significant portion of the Class, defeating commonality.[6]

Yet another schism among Class members cuts across the aforementioned rifts and further divides the Class into three groups: (1) those who began their relationship with Angie's List <u>before</u> the SR Path was introduced and experienced a *decrease* in overall contacts as a result of the SR Path; (2) those who began their relationship with Angie's List <u>before</u> the SR Path was introduced and experienced an *increase* in overall

---

[6] Pro Water asserts in passing that the fact that some Class members were given estimates is "no reason to deny certification, because the class definition can easily be amended to exclude class members who received such agreements." (Reply 8.) But because the proportion of Class members who received estimates is not at all insubstantial, excluding these would fundamentally change the nature and composition of the Class. Moreover, some Class members did not receive estimates at the beginning of the Class period and began receiving estimates at some point during the class period. Nowhere in its briefs does Pro Water articulate a plausible proposal for dealing with such class members or, more generally, for amending the class definition in so fundamental a way.

contacts as a result of the SR Path, and (3) those who began their relationship with Angie's List <u>after</u> the SR Path was introduced. As Pro Water itself detailed in its Second Amended Complaint, it and other longtime service providers have come to rely heavily on the benefits and goodwill associated with advertising on the Angie's List website, such that terminating their relationship with Angie's List is not a viable option. (*See* SAC ¶¶ 9–15.) Longtime service providers in group (1) have a colorable argument that it was unfair of Angie's List to introduce a feature that served to divert homeowners to non-Angie's List service providers, especially when its service providers are so heavily dependent on Angie's List. On the other hand, the more fortunate service providers in group (2) have significantly less basis on which to argue that the particular way that Angie's List chose to populate its SR Path search results was unfair. And none of these observations apply in the first instance to service providers in group (3) because these providers joined Angie's List after the SR Path had already gone live and therefore had no expectations regarding the effect of the SR Path on any prior contact count. This difference fundamentally changes the nature and result of the multifactor, all-things-considered UCL unfairness analysis as to these service providers.

If part of the unfairness analysis includes considering the "impact on [the] alleged victim," *S. Bay Chevrolet*, 72 Cal. App. 4th at 886, then the Court must consider the length and depth of a service provider's relationship with Angie's List as part of the unfairness analysis, because these details change the extent to which the service provider is impacted. These further variations make the central "unfairness" question even less likely to generate common answers. *Dukes*, 564 U.S. at 351; *see Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 469 (C.D. Cal. 2014) (finding no commonality in case where plaintiff accused Apple of double-charging for downloads, where individualized inquiries would be required to determine which class members (1) genuinely clicked "buy" only once but were charged twice, and (2) clicked "buy" twice despite the appearance of a pop-up warning them about the potential double charge and never applied for a refund).

2.   *Unique position of Subclass*

The existence of the Subclass as a subset of the Class further decreases the likelihood that the central "unfairness" question will generate common answers across the Class  As discussed, the Subclass consists of the dual advertisers: those who paid Angie's List periodic fees for advertising and featured placement and who also paid HomeAdvisor for individual homeowner leads.  The Class's argument, of course, is that it was unfair of Angie's List to include HomeAdvisor service providers in the SR Path search results.  But the Subclass members are the very HomeAdvisor service providers who were appearing in the SR Path search results.  The Subclass members thus paid for and benefitted from the very thing the Class is arguing that Angie's List should not have done.

For this reason, the Subclass, were it to receive restitution based on the model Pro Water offers for the entire Class, would receive what can be fairly characterized as a windfall.  Monetary recovery under the California UCL is limited to restitution, which is "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) (quoting *Cortez v. Purolator Air Filtrations Prods. Co.*, 23 Cal. 4th 163, 174 (2000)).  Here, the members of the Subclass, by virtue of their relationship with HomeAdvisor, already received the benefits of having been included in SR Path search results.  Yet, under Pro Water's proposed classwide restitution model, Subclass members would receive a partial refund of their Angie's List advertising dollars, meant to put them where they would be if Angie's List had never included HomeAdvisor service providers in SR Path search results.  To reap a benefit, and then to receive restitution based on *not* having received that benefit, is to collect an inappropriate windfall.  *See* Rest. (3d) of Restitution & Unjust Enrichment (2011) ("Restatement") § 44(3)(b) (stating that restitution may be limited or denied to avoid "inappropriate windfall"); *Lanovaz v. Twinings N. Am., Inc.*, No. 12-cv-02646-R, 2015 WL 729705, at *2 (N.D. Cal. Feb. 19, 2015) (citing to Restatement in determining

available restitution remedy under California consumer protection statutes, including
UCL).

Ultimately, though, this is a Rule 23 analysis, not a merits analysis, so the Court
need not determine whether Pro Water or any particular Subclass member is in fact
barred from recovery on the basis of windfall (or perhaps waiver, or any other theory
or approach).  The point here is that this unique feature of the Subclass significantly
changes a part of the "unfairness" analysis.  That change must be considered along with
all the other facts and circumstances of a service provider's relationship to Angie's List,
and accordingly, whether Angie's List's conduct was "unfair" is not a question that is
likely to "generate common *answers* apt to drive the resolution of the litigation."
*Dukes*, 564 U.S. at 351.

### 3.    *Lack of merit of Pro Water's claim*

The third and final observation defeating commonality is that the claim of Pro
Water itself, as delineated by the restitution model it presents and the corresponding
theory of the case, is unmeritorious as a matter of law.

Under California law, courts considering whether a business practice is "unfair"
to consumers[7] under the UCL apply the test articulated under section 5 of the Federal
Trade Commission Act.  *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394,
1403 (2006).  Under this test, "a business practice is 'unfair' if (1) the consumer injury
is substantial; (2) the injury is not outweighed by any countervailing benefits to
consumers or competition; and (3) the injury could not reasonably have been avoided
by consumers themselves."  *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342,
1376, n.14 (2012).

Here, at root, Pro Water asserts that Angie's List's including HomeAdvisor
service providers in the SR Path search results was unfair, because Angie's List both

---

[7] As Pro Water is a consumer of Angie's List's services, rather than a service provider platform that
competes directly with Angie's List, Pro Water's UCL claim is a "consumer" UCL claim, not a
business competitor UCL claim.  *See Cel-Tech*, 20 Cal. 4th at 187 (recognizing this distinction and its
importance).

(1) led its service providers to believe that it would feature only its own service providers on its website, and (2) allowed HomeAdvisor service providers to be included in SR Path search results without informing its own service providers that there was another way to be featured in the SR Path.

As to the first contention, Pro Water fails to point to any representation or combination of representations on Angie's List's part that plausibly suggest that Angie's List somehow communicated such a promise to service providers.  The Court thoroughly considered this issue in its Order granting Defendant's motion to dismiss the First Amended Complaint, (Order Mot. Dismiss FAC 13, ECF No. 45), and again emphasized it in the Order on Defendants' motion to dismiss the Second Amended Complaint, (Order Mot. Dismiss SAC 8).

As to the second contention, generally, a business's practices are not "unfair," nor do they "harm" clients and consumers, merely because that business offers its products or services under certain terms to some but different terms to others.  *See Buller v. Sutter Health*, 160 Cal. App. 4th 981, 991–92 (2008) (finding nothing "unfair" about a health insurer having a discretionary (i.e., only-if-asked) discount policy).  Applying this principle here, Angie's List service providers received the benefit of their bargain, and the mere fact that providers could appear in SR Path search results under terms offered by one subsidiary of Angi (Angie's List) and could also appear in SR Path search results under different terms offered by a different subsidiary of Angi (HomeAdvisor) does not, in and of itself, render Defendants' conduct unfair under the UCL.  There must be something more, and here, Pro Water does not point to anything more.  *See id.*; *cf. Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036, 1046 (C.D. Cal. 2008) ("[P]laintiffs[] claim that the UCL requires defendants to charge them in accordance with . . . allegedly more accurate measurements . . . .  However, that is not the deal that plaintiffs struck, and the UCL cannot be used to rewrite their contracts or to determine whether the terms of their contracts are fair." (footnote omitted)); *cf. also Samura v. Kaiser Found. Health Plan, Inc.*, 17 Cal. App. 4th 1284, 1299 n.6 (1993)

(observing that California UCL "does not give the courts a general license to review the fairness of contracts but rather has been used to enjoin deceptive or sharp practices").

Pro Water's unique position as a dual advertiser further supports the conclusion that its claim (as delimited by the only restitution model it offers) has no merit. Pro Water paid HomeAdvisor for leads, and HomeAdvisor obtained those leads by, among other things, getting its clients, including Subclass members, listed in the SR Path. To show that Angie's List's conduct was unfair, Pro Water will have to show that the harm it incurred outweighed the utility of Angie's List's allowing HomeAdvisor clients to be listed in the SR Path. *See Rubio*, 613 F.3d at 1205. But in the case of a Subclass member such as Pro Water, the harm engendered by this practice is very low, and the utility is very high. The harm is low because Angie's List's inclusion of HomeAdvisor service providers in the SR Path did not actually cause Pro Water to not appear in SR Path. It continued to appear in SR Path, sometimes as an Angie's List service provider (based on its periodic payments to Angie's List), and sometimes as a HomeAdvisor service provider (based on its per-lead payments to HomeAdvisor). The utility of this practice is high to both Angie's List and HomeAdvisor: to Angie's List, because the practice increased the available pool of service providers and enabled Angie's List to better connect homeowners to providers; and to HomeAdvisor, because HomeAdvisor was able to sell more leads to its own service providers—the very thing those service providers were paying for and wanted HomeAdvisor to do. This utility also inured to the benefit of both businesses' clients, including Pro Water.

Under these facts, which are set forth in the operative Second Amended Complaint and are otherwise undisputed, Pro Water's claim for unfair business practices lacks merit as a matter of law. The ability of the Court to dispose of Pro Water's claim with a judgment-on-the-pleadings-type analysis demonstrates that commonality fails, as there is no need to generate any common answers that might drive the resolution of the litigation, and, more simply, because there is no further litigation to resolve.

## C.    Predominance

Even if there are common questions, class certification would nevertheless fail on the "predominance" requirement of Rule 23(b)(3) because the Class would not be "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods,* 521 U.S. at 623.

Commonality "is about invoking common questions," *Allen*, 2010 WL 11583099, at *5, whereas the predominance analysis requires district courts to formulate "some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case," *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008).    The predominance analysis thus "focuses on 'the relationship between the common and individual issues' in the case." *Wong v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)).   Courts must "identify[] the substantive issues that will control the outcome, assess[] which issues will predominate, and then determin[e] whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Herskowitz*, 301 F.R.D. at 469 (quoting *Gene & Gene LLC v. BioPay LLC,* 541 F.3d 318, 326 (5th Cir. 2008)).   The inquiry "is not whether common questions predominate with respect to individual elements or affirmative defenses; rather, the inquiry is a holistic one, in which the Court considers whether overall, considering the issues to be litigated, common issues will predominate." *Id.* at 470 (citing *Amgen*, 568 U.S. at 468).

Here, individual questions predominate over common questions with respect to both liability and damages, making class certification inappropriate under Rule 23(b)(3). *Cf. Pulaski & Middleman*, 802 F.3d at 985 ("Entitlement to restitution is a separate inquiry from the amount of restitution owed under California's UCL . . . .").

       *1.*    *Liability inquiry*

First, for many of the reasons discussed in connection with commonality, individual questions predominate over common ones in the liability inquiry.  *See Dukes*, 564 U.S. at 375 (Ginsburg, J., concurring) (cautioning against eliding the Rule 23(a)(2) "threshold criterion" of commonality with "the more demanding criteria" of predominance under Rule 23(b)(3)).  The first individualized inquiry, discussed above, will relate to how the fact that Angie's List provided certain Class members an estimated number of contacts affects the unfairness inquiry.  This would not be a mere matter of sorting class members into those whose actual contacts exceeded or fell short of the express estimates.  The exact degree of excess or deficit is material to the "unfair" inquiry under the UCL, such that the Court would need to conduct individualized factual determinations for the class members who received express estimates (a material portion of the Class by any measure) and then make individualized legal determinations whether, given the accuracy of the estimate along with all other considerations, Angie's List's conduct shakes out as "unfair" to that class member.

The rift between those who became Angie's List advertisers before and after SR Path was introduced further defeats predominance.  Those who had been advertising for a significant period of time before the introduction of SR Path had a distinct set of expectations with respect to the return on their advertising investment.  If the introduction of SR Path caused a given service provider's rate of contacts to significantly rise, that fact will militate against a finding of unfairness with respect to that provider.  If, on the other hand, the introduction of SR Path caused the provider's rate of contacts to decrease, this would militate for a finding of unfairness.  Again, this rift is not something that could be addressed by merely carving the Class into further subclasses, because the *degree* of the effect of the SR Path is material.  The degree of the effect varies from class member to class member and must be considered in light of all the other factors.  Individualized inquiries would be required to make the unfairness determination.

2.     *Damages inquiry; restitution model*

Moreover, Pro Water's restitution model is not a fair proxy for restitution given its theory of the case.  Thus, individual questions predominate not only the liability inquiry; they predominate the damages inquiry as well.

In a typical class action for money damages, parties seeking class certification must provide the court with a proposal or model for calculating damages on a classwide basis.  *Behrend*, 802 F.3d at 1435 (instructing district courts to inquire whether the proposed damages model translates "legal theory of the harmful event into an analysis of the economic impact of that event." (emphasis omitted)); *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[P]laintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.").  If no such model is suggested, the court may conclude that individualized damages inquiries will overwhelm any common questions, signaling a failure of the predominance requirement.  *Behrend*, 802 F.3d at 1433 ("If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).").

The same principles apply to Pro Water's proposed restitution model.  As discussed, the remedy at issue here is restitution under the California UCL, which "must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 698 (2006).  In calculating restitution, California law "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938–39 (9th Cir. 1999).

Applying these principles, the first problem with Pro Water's restitution model is that it uses appearances in SR Path search results as a proxy for contacts actually received.  As indicated by Pro Water's restitution model example quoted above, a core

24

assumption of Pro Water's restitution model is that, if an Angie's List service provider
received twenty contacts from SR Path, but 50% of the SR Path search results during
that time were HomeAdvisor service providers, then the Angie's List service provider
should have received forty contacts from SR Path.  The problem is that an appearance
in SR Path does not necessarily translate to a contact, and impermissible speculation is
required to conclude that a higher proportion of appearances directly corresponds to a
higher number of contacts.

Pro Water's restitution model suffers from a related problem in its methodology.
In Pro Water's initial example, the second input—the percentage of SR Path search
results that were Angie's List service providers—was 0.5, or 50%.  Pro Water would
have the Court believe that determining this input for a given service provider is a
simple matter of looking to Angie's List's data.  Yet, Pro Water does not articulate with
specificity how it intends to parse out the data to derive this input (either to be used
across the class or calculated individually for each class member).

An example illustrates the problem.  Suppose that an analysis of the entirety of
Angie's List's SR Path data in the relevant limitations period showed that, on average,
40% of the results displayed in SR Path search results went to HomeAdvisor service
providers, it would nevertheless be inappropriate to presume that this value for *all* Class
members is 0.4.  As Defendants point out without dispute, some categories of Angie's
List service providers had no corresponding category on HomeAdvisor, so no
HomeAdvisor providers would appear in SR Path searches in these categories.  Angie's
List service providers in such a category would receive an unfair windfall by being
assigned a *y* value of 0.4.

More generally, Defendants demonstrate that the balance of Angie's List and
HomeAdvisor service providers in the SR Path search results was constantly in flux,
not only over time, but even from search to search.  As discussed, if HomeAdvisor could
not provide any suitable service providers based on the search parameters the
homeowner entered into SR Path (or could find only one), Angie's List would populate

the remaining results with its own service providers. Thus, the proportion of search results that went to Angie's List service providers is intimately and immediately dependent upon the parameters each individual homeowner input into the SR Path.

These observations cause the Court to ask what subset of SR Path search results Pro Water might propose to use to calculate this input for any given service provider. Pro Water suggests that "[d]efendants . . . can provide information for any given time period regarding . . . (3) the number of times the Class members appeared in SR Path results, [and] (4) the corresponding number of times HA Advertisers appeared in SR Path results." (Reply 14.) In essence, the argument stumbles on the word "corresponding." If a Class member appeared in a given SR Path result, then it makes no sense to look at the number of times HomeAdvisor service providers appeared in that same—i.e., the "corresponding"—SR Path result, because that Class member was already appearing in that SR Path search result. Instead, for Pro Water's model to work, for each Class member, there must be some subset of SR Path search results in which the Class member did *not* appear, and in which the Class member asserts it *should have* appeared.

This is precisely the aspect of the restitution model Pro Water fails to address: the subset of SR Path search results to be used to derive the second input for each class member. The answer is not simply "all SR Path searches during the Class period"; some Angie's List service provider categories had no corresponding HomeAdvisor category, so those service providers were not harmed by the appearance of HomeAdvisor service providers in the SR Path, and they are therefore not entitled to any restitution. Nor would the answer be (for, say, Pro Water), "all searches for water treatment service providers during the Class period"; for such searches, it is possible that Pro Water might not have appeared in the SR Path results because another parameter the homeowner provided (such as location or timeframe) excluded Pro Water as a possibility. Thus, it is erroneous to assume that a result on a given SR Path search that went to a HomeAdvisor water treatment service provider would have necessarily

gone to Pro Water instead.  For the restitution model to work, Pro Water must be able to articulate a subset of SR Path search results in which it *did not* appear and *would have* appeared, and it must articulate a classwide method for analyzing Angie's List's data to arrive at the proper input value for each class member.  Pro Water fails in this burden.

For these reasons, Pro Water's restitution model fails.  When a restitution or damages model fails and the moving party presents no alternative method for calculating damages on a classwide basis, individual issues predominate the damages inquiry, and class certification is properly denied.  *See, e.g.*, *Behrend*, 569 U.S. at 34.

### D.   The HomeAdvisor Subclass

Having determined that certification of the Class is not appropriate, the Court considers whether certifying the HomeAdvisor Subclass may be appropriate.  Although Pro Water defines the HomeAdvisor Subclass, its Motion lacks a clear indication of how the harm the Subclass suffered is different from the harm the Class suffered and, more generally, does not address any class certification questions or points of analysis that are unique to the Subclass.  Moreover, Pro Water provides no restitution model based on the harm specific to the Subclass.  On this basis, the Court sees no reason to define a Subclass separate from the Class, and certification of the Subclass is further denied on this basis.

///
///
///
///
///
///
///
///
///

1

## VII.   CONCLUSION

2       For the foregoing reasons, the Court **DENIES** Pro Water's Motion to Certify

3 Class **with prejudice**.  (ECF No. 81.)  The Court **STRIKES** Defendants' Objections

4 and Response to Objections.  (ECF Nos. 95, 96.)

5

6       **IT IS SO ORDERED.**

7

8       October 17, 2022

9

10

11

12                       **OTIS D. WRIGHT, II**

13              **UNITED STATES DISTRICT JUDGE**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28